## Mills, Appellant, *v.* Plant.

*Practice, C. P.—Trial—Charge—Competency of witness.*

It is not reversible error for the trial judge in referring to an act of the defendant to remark that the reason for the act was not given in evidence because the defendant was not a competent witness.

*Decedent's estates—Evidence—Charge—Medical services.*

In an action by an administrator on a bond given for the maintenance of the decedent to recover for support and medical services rendered to decedent after she had left the defendant's house, where it appears that the medical services were rendered by a son of the decedent, it is not error for the court to say in its charge that the jury were not to conclude that the medical services were worth what the son testified they were worth simply because he said so, but that they were to fix what would be a reasonable compensation from all the evidence in the case. In such a case the alleged erroneous remark becomes of no practical importance whatever, if the jury returns a verdict for defendant on the ground that decedent was not justified in leaving defendant's house.

Argued May 13, 1901. Appeal, No. 48, April T., 1901, by plaintiff, from judgment of C. P. Mercer Co., April T., 1897, No. 265, on verdict for defendant in case of S. L. Mills, Administrator of Isabella Mitchell, Deceased, v. P. A. Plant and W. B. Plant. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed.

Issue to determine the validity of a judgment entered on a bond for the support of Isabella Mitchell. Before MILLER, P. J.

The court charged in part as follows:

The plaintiff in this case is the administrator of Isabella

Mitchell, deceased. It appears from the evidence that on March 17, 1897, P. A. Plant and W. B. Plant, the defendants in this suit, made and delivered to Isabella Mitchell a bond in the penal sum of $1,000, the condition of which was that P. A. Plant, one of the defendants, "for and during the lifetime of Isabella Mitchell would support and maintain the said Isabella Mitchell with everything needful for her comfortable support, including food and clothing suitable to a person of her age and condition, medical and other attendance in sickness, two separate rooms in his dwelling for her own use, and in all respects careful and kindly treatment while she lives and a decent burial after her death."

So far as that portion of the obligation which required the defendant to provide a decent funeral for Mrs. Mitchell after her death, there is no allegation but what the defendant, P. A. Plant, performed that duty. What is alleged by the plaintiff in this suit is that he did not support and maintain her and care for her in the manner in which he obligated himself to do. Until the morning of February 19, 1898, so far as we recall the testimony, there is no complaint of any lack of duty on the part of P. A. Plant. She commenced living with Plant on or about April 1, 1897, and had continued to live with him from that time up until February 19. A few days before that the wife of P. A. Plant had gone to Williamsfield, Ohio, on account of the sickness of her mother, and Mrs. Mitchell taking sick on the morning of the 19th, Mr. Plant called in a neighbor, Mrs. Vanderslice, who lived nearby, and also went for a physician. Not being able to obtain the family physician of Mrs. Mitchell, he called on Dr. Mitchell, the son, and either after he came or before he arrived Mrs. Vanderslice came. Mrs. Mitchell was lying upon a couch, and from indications she had been sick and vomiting. Some talk occurred between Dr. Mitchell and Mr. Plant, which you will recall, and Dr. Mitchell left. During the day Mr. Plant undertook to change the stove in the room which Mrs. Mitchell occupied. Up until the day of February 19 there had been a hard coal stove in her room, and the evidence seemed to indicate that Mrs. Mitchell was not able to care for that stove or properly manage it. One or more testified that at times she would shake not only the ashes out of the stove, but the fire and the coal out of it into the ash box, and

thereby put the fire out, or so nearly put it out that it had to
be rekindled.   Other witnesses were called by the plaintiff who
testified that the old lady called them in at different times—
this was prior to February 19, as we understand it—and she
complained of her stove; and one witness that I recall states
that on examining it he found the damper was not properly ad-
justed; and another witness testifies that the fire apparently
was out—whether it was burned out or shaken out he could not
state; he said he made no examination about that.   Mrs.
Mitchell wanted him to make a fire, which he declined to do.
Now, in all that evidence, so far as we recall the testimony,
there is no claim that Mrs. Mitchell had ever called upon the
family of Mr. Plant, or any member of it, to make any fire, or
make any repairs in the stove, that was declined by them.
There was evidence by Mrs. Birch that one morning at table
there was some talk about the condition of the stove, and that
Mr. Birch inquired of Mrs. Mitchell why she was shaking it the
night before, and that she stated that she was not shaking it dur-
ing the night, and that he remarked that he had heard her
shake it.   [For some reason (Mr. Plant is not a competent
witness to testify to anything that took place in the lifetime of
Mrs. Mitchell), we are not informed why, he undertook to
change the stove.   I do not remember of any witness who testi-
fied to the reason, but it seemed there was some talk between
him and Dr. Bailey, who was the physician of Mrs. Mitchell,
and that that talk between Dr. Bailey and Mr. Plant was rela-
tive to changing the stove, and after that talk, at all events,
Mr. Plant undertook to exchange the hard coal stove for the
soft coal stove.   What took place there is only testified to by
Mrs. Adams.   The only persons present were Mrs. Adams, the
decedent and Mr. Plant.   Mrs. Mitchell, in her deposition,
which was read, gives a partial statement in regard to it.   She
says in that deposition: " He took down the hard burner and
put up a soft burner, and I was cold.   I don't know whether
the stove was sufficient to keep it warm or not."   That is all
that Mrs. Mitchell says in regard to it.   Mr. Plant is not a
competent witness to testify as to what took place; he is not
permitted by law to testify.]   [1]   Mrs. Adams says that she
was in the room; that she had been called in by Mrs. Mitchell;
and that after the hard coal stove was removed from where it

stood that he, Mr. Plant, undertook to set the soft coal stove in its place ; that Mrs. Mitchell got immediately under the stove pipe and got soot on her person ; that Mrs. Adams asked her not to stand there, but she did stand there, notwithstanding their remonstrances, and that the soot fell down on her head and body ; and that when Mr. Plant undertook to put the stove in place he had to remove her some distance away from the place so as to get the other stove set up; that after he got the stove set up and a fire lighted, Mrs. Mitchell sat down close to the stove, and when it got warmer she moved back about two feet and sat there for quite a while, and then she got a bucket of water and poured it in the stove door on the fire. Soon after that, according to the testimony of Mrs. Adams, Dr. Mitchell came there and took her to his home.

Now, it is for you to say from all this evidence whether Mr. Plant was justified in changing the stove from a hard coal burner to a soft coal burner.

   \*    \*    \*    \*    \*    \*    \*    \*

[Had Mr. Plant done anything that warranted her in resisting the change of the stoves, and in placing herself so close to it that the heat became so great that she would be warranted in putting water in the stove to put the fire out ? Had he done anything to justify her in doing this ? Or, did she do this because of obstinacy — (some of the witnesses, and possibly Dr. Mitchell himself, testified that she was very obstinate and hard to get along with)—was that the reaason ? For if she did that from obstinacy and without justification, that would not warrant her in leaving on that day ; nor would it warrant Dr. Mitchell in taking her on that day, if that was all.] [2] This was on Saturday, and it appears that on the following Monday morning she went back to Mr. Plant's. There is some testimony about her food, but with the exception of a single meal that was furnished her on this evening by Mr. Plant's sister, is there any evidence that the food that was furnished her by Mr. Plant was not suitable for her? Who is it that testifies that on any occasion excepting this one the food furnished her was not suitable for her, prior to that time ? On one time that Dr. Mitchell recalled, whether it was on this Saturday or on Monday or Tuesday, but at some time, he testifies that he said to Mr. Plant that his mother required certain food, among it

eggs, and Mr. Plant said that he would not buy eggs, that they cost too much; and Mr. Plant being called in that matter, said that no such conversation took place between him and Dr. Mitchell. It is for you to decide that question; it is for you to say what the truth of that matter is. Did Dr. Mitchell say to him at some time that certain food was required by his mother, and did Mr. Plant say that he would not furnish it? . . . . Mrs. Mitchell went back to Plant's on Monday morning, or perhaps Dr. Mitchell took her back; you will remember. She came back to Dr. Mitchell's on Monday evening. She went back to Plant's Tuesday morning, and she came back Tuesday evening to Dr. Mitchell's. I think she went back on Wednesday, but at all events on Thursday evening she came back to Dr. Mitchell's. Why she left is for you to find from the evidence. Is there any evidence as to any ill treatment on the part of the defendant, Mr. Plant, on Monday or Tuesday, or Wednesday or Thursday, that warranted her in leaving his house? Does any witness testify to any facts that would warrant you in finding that he had ill treated her on any of those days, or that he had failed to do what he agreed to in this bond, " to support and maintain the said Isabella Mitchell with everything needful for her comfortable support, including food and clothing suitable to a person of her age and condition, medical and other attendance in sickness, and two separate rooms in his dwelling house?" Is there any witness that testifies to any fact that would warrant you in finding that on Tuesday, Wednesday or Thursday he had not complied with the conditions of that bond? If there is evidence of that kind you will apply it to this case. If there is no evidence of that kind, then you should conclude there was no evidence that he had broken the condition of the bond during any of those days. . . .

[On February 28 Mrs. Mitchell became a permanent member of Dr. Mitchell's family, and the fact that you are to determine, and the gist of this whole case, is, was Mrs. Mitchell justified in leaving the home of Mr. Plant on February 28, and remaining away from there? Had he neglected to do anything that he had obligated himself to do in his bond prior and up to February 28, that justified her in leaving his house? For, if he had not, the administrator cannot recover in this case, and ought not to recover.] [3] He agreed to keep her and main-

tain her and furnish her the rooms at his own house. That is the contract he made, not to furnish her maintenance and support and nursing at Dr. Mitchell's house, or at some other house, but to furnish this at his own place. It reads: " The above bounden Plummer A. Plant, his heirs, executors and administrators, shall and do well and truly from and after the first day of April, A. D. 1897, and during the period of her natural life, support and maintain the said Isabella Mitchell with everything needful for her comfortable support, including food and clothing suitable to a person of her age and condition, medical and other attendance in sickness, two separate rooms in his dwelling house for her own use, and in all respects careful and kindly treatment while she lives." This support and attendance was to be furnished her at his house ; and so long as he furnished the support, maintenance, attendance, medical and otherwise, and clothing, that he bound himself to do, at his house, he fulfilled his part of the contract. [If without proper cause—without reasonable and just cause—she left his place on February 28, 1898, she could not recover, nor could her administrator recover for any maintenance, support, attendance or nursing given her after that date.] [4]   So that the first question you are to determine when you retire to your rooms is, did he fulfill his contract? If he did, then your verdict should be in favor of the defendant; for it is admitted that so far as the funeral expenses are concerned, that he has settled for them in full, and that he has paid into court some other items that the plaintiff claims, and paid the cost up to that date, and that that money is in court for the plaintiff. [So that the only question you will inquire of is, did he up until February 28 furnish her the support, maintenance, clothing and attendance that he was bound to do by his bond? If he had up to that date, and she left through some whim or caprice, or through obstinacy, the plaintiff in this case cannot recover, and your verdict would be and ought to be for the defendant.] [5]   If, however, you should find from the evidence that she was justified in leaving, that is, that he did not fulfill his contract up to that time, that he did not maintain her in the way that he agreed to, that he did not give her the attendance he agreed to, up to that time—if you find that as a fact, then your verdict would be and ought to be in favor

of the plaintiff; and the amount of your verdict would rest on the evidence in that case.

If you should come to that point, gentlemen, the plaintiff's claim as to that is for boarding from March 1, to July 12, the day that Mrs. Mitchell died. That is one item, and you will find from the evidence what her boarding was reasonably worth for that period. Then, they have for nursing from March 1, to July 12, a period of about nineteen weeks. The evidence is, on the part of the plaintiff, that for the first seven weeks the nursing was not difficult, and that for the last eight weeks it was difficult; that for the last two weeks of Mrs. Mitchell's life, according to the evidence of two or more witnesses, she was not able to control the action of her bowels or urinary organs, and that therefore it made it more difficult to wait on her and care for her during those two weeks. In considering what would be a reasonable compensation for her nursing for the first seven weeks you will have regard to the testimony; what would be a reasonable compensation for the remaining eight weeks, you will have regard to her condition during the first six weeks of the eight and during the last two weeks of the eight; and you will also have regard to the testimony thereto. I suppose there are some witnesses, like Mrs. St. Clair, who would not do such nursing at all, and hence she fixed the price, what she considered it is worth, on what she would or would not do; she thinks it is worth $40.00 a week. It is not likely you will give that evidence a great deal of weight; you will give it, however, the weight you think it is entitled to. The plaintiff claims that during the last eight weeks the nursing was worth $20.00 a week. Dr. Mitchell testified in his opinion it was worth $25.00 a week, and Mrs. Gaylord that she thought it was worth $28.00, and Mr. McMaster that it was worth $14.00 a week; Dr. Weidman, a physician, that it would be worth $14.00 per week; Dr. Bailey, who lives in Jamestown, testified that $7.00 a week would be a reasonable compensation for her nursing during a certain portion of that illness; and he tells us that in that locality the nurse takes entire charge of the patient, not for twelve hours, but for twenty-four hours, and he fixes the price at $7.00 per week. You will take all the testimony, what the plaintiff claims, what Dr. Mitchell, Mrs. Gaylord, Mr. McMaster, Mrs. St. Clair, Dr. Weidman and Dr. Bailey fix it at, and say what

that nursing would be reasonably worth.  Is it worth $25.00 or $28.00 as claimed by the witness placing it at the highest, or is it worth $7.00 as claimed by Dr. Bailey, or is it worth the intermediate amount as fixed by the other witnesses I have named?

[They also have a claim for medical attendance rendered by Dr. Mitchell during nineteen weeks, and Dr. Mitchell fixes that himself at from $150 to $175, including the medicines.  Dr. Mitchell is the only witness called upon that point, but you are to consider that evidence.  You are not to conclude it was worth $150 or $175, simply because Dr. Mitchell testifies to that fact; you will fix what you think would be a reasonable compensation for her medical attendance during that period from all the evidence in the case.] [6]

Verdict and judgment for defendant.  Plaintiff appealed.

*Errors assigned* among others were (1–6) above instructions, quoting them.

*W. H. Cochran*, with him *A. W. Williams*, for appellant, cited: Lehigh Valley R. R. Co. v. Brandtmaier, 113 Pa. 619; Pennsylvania Canal Co. v. Harris, 101 Pa. 92; Pierson v. Duncan, 162 Pa. 193.

*W. C. Pettit*, for appellee.

OPINION BY BEAVER, J., July 25, 1901:

In the statement of the questions involved and in the appellant's argument, the ten assignments of error are summed up in three distinct propositions.  The first relates to the statement, which is repeated in the charge, that " Mr. Plant is not a competent witness to testify to anything that took place in the lifetime of Mrs. Mitchell."  The fact of his incompetency is not denied but the complaint is that the interjection of the remark was by way of explanation which the court had no right to make and that it in some way invited the sympathy of the jury.  The explanation was both natural and necessary.  The remark was made in connection with a complaint made by the decedent as to the change of a stove in the room occupied by her, and the trial judge, in the course of his charge, simply remarked that the reason for making the change was not given

in the evidence for the reason that the defendant was not a competent witness. There was certainly nothing wrong in this, nor can we see how the sympathy of the jury was either invited or incited thereby.

The second proposition relates to a remark of the court in reference to the testimony of Dr. Mitchell, a son of the decedent, who testified as to the value of the medicine and medical attendance furnished by him, for the recovery of which, among other things, the suit was brought by the administrator of his mother. The court said: "Dr. Mitchell is the only witness called upon that point but you are to consider that evidence. You are not to conclude it was worth $150 or $175 simply because Dr. Mitchell testifies to that fact. You will fix what you think would be a reasonable compensation for her medical attendance during that period from all the evidence in the case." There was nothing erroneous in this instruction, the court evidently intending thereby to caution the jury that, because Dr. Mitchell was a son of the decedent, his testimony was not for that reason to be excluded from their consideration but that they were not bound by his estimate of his services but could fix such compensation as in their judgment would be reasonable, under all the evidence. But the question is one of no practical importance for the reason that the jury found for the defendant and, therefore, evidently did not reach the question of the value of Dr. Mitchell's medicines and medical attendance. The main question in the case was as to the defendant's liability under a bond which he had given for the maintenance of the decedent and whether or not he was absolved from the obligations of the bond by the alleged unjustifiable departure of the decedent from under his roof. Having found this question in favor of the defendant, all the other questions as to the amount to be recovered ceased to be of any importance.

The third proposition relates to the entire charge of the court as being "prejudicial to the plaintiff's cause, especially in not calling attention to the mental condition of Mrs. Mitchell." It is to be observed that the court affirmed all of the plaintiff's points and refused all of the defendant's points, except two. In the trial of the case the plaintiff seemed to object to any testimony relating to the mental condition of the decedent. In the cross-examination of Dr. Mitchell, her son, this testimony occurs:

" Q. What was the condition of her mind? A. Her mind wasn't very good and hadn't been for five or six years. Q. Is it not a fact that you had a committee appointed for her about the time of this occurrence? A. Immediately afterwards I did. Q. You had the court of common pleas appoint a committee over her, because her mind was weak? Is that true? (Objected to.) By Mr. Cochran: I will admit she had a guardian appointed—there was no committee appointed—because she was not able to take care of herself. By Mr. Gillespie: Because of weak mind? By the witness: No; she wanted somebody to take care of her she said. Q. Wasn't it because she was of weak mind? A. Her mind wasn't very strong." Her mental incapacity was not dwelt upon by the witnesses for the plaintiff and no instructions in regard to it were asked by plaintiff's counsel in their points. It is difficult to understand from the argument just what the appellant desired the court to say in regard to her mental incapacity and, whether mentally capable or not, the defendant would scarcely have been justified in taking the decedent away from the house of her son during her last illness under the circumstances. We have read the entire charge, first in the general perusal of the paper-book and subsequently with reference to the tenth assignment of error, which asserts the prejudicial character of the charge to the plaintiff's claim, but have failed to see wherein the complaint is justified. The case was clearly and fully presented to the jury, the plaintiff's points for charge were all affirmed, and both the points of the plaintiff which were affirmed related to the simple proposition that there could be no recovery on the part of the plaintiff, unless the defendant had failed in the duty which he owed to the decedent to maintain her in accordance with the provisions of his bond.

Upon a careful consideration of the whole case, we can see nothing which calls for or would justify a reversal.

Judgment affirmed.